Filed 5/3/21  P. v. Pharr CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C087195 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFE20170013697) |
| v. | |
| ANGELO LEMELLE PHARR, | |
| Defendant and Appellant. | |

A jury found defendant Angelo Lemelle Pharr guilty of shooting at an inhabited dwelling, assault with a semiautomatic firearm, and felon in possession of a gun and felon in possession of ammunition.  He was sentenced to an aggregate term of 18 years four months.

On appeal, he contends (1) the trial court abused its discretion in denying his motion for a new trial; (2) insufficient evidence supported the convictions for shooting at an inhabited dwelling and assault with a semi-automatic firearm; (3) insufficient evidence

1

supported the convictions for felon in possession of a firearm and ammunition; (4) the court erred in failing to instruct sua sponte on the defense of alibi; (5) the 18-year four-month sentence is cruel and unusual; (6) the punishment for possessing ammunition must be stayed under Penal Code section 654[1]; (7) remand is required in light of *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*); and (8) remand is required in light of Senate Bill No. 1393 (2017-2018 Reg. Sess; Stats. 2018, ch. 1013, §§ 1-2) (S.B. 1393).

We remand so the trial court may consider striking the prior serious felony enhancement in light of S.B. 1393.  We otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Shooting

The victim is the father of defendant's ex-girlfriend.  He testified that on the morning of the shooting, he got up, took a shower and started shaving.  While shaving, bullets flew through his house, hitting his front door and windows.  He looked out the front door and saw two men running down the street.[2]

Later, a neighbor with a surveillance camera told him:  " 'Don't worry about it.  It's on camera.' "

In the surveillance video, which was shown to the jury, a black SUV can be seen parked on the street in front of the victim's house.  Moments later, as the camera panned back to the same spot, the SUV was gone, but an African American male wearing a red

---

[1] Undesignated statutory references are to the Penal Code.

[2] On cross examination, the victim testified that defendant was one of the men he saw running down the street after shots were fired.  On redirect, the victim admitted he did not actually see appellant running away from his house but believed it was him from what he heard from others and from viewing a neighbor's surveillance video.

long-sleeved shirt, light colored pants, and dark colored shoes was standing in the street. The man opened fire with a black handgun.[3]

The camera then panned away, but when it returned, a suspect could be seen across the street.

A neighbor testified to hearing gunshots, after which he looked through the window to see two individuals running, each wearing hoodies, red sweaters, and red bandanas over their faces; one had a gun. The neighbor then watched them get into an SUV that had just parked; though he could not see the driver. The SUV then drove off, heading in the direction of the freeway. The neighbor then called 911.

The 911 call, which was played for the jury, came in at 8:36 a.m.

### Events Pertaining to Defendant's Ex-girlfriend Prior to the Shooting

Several days before the shooting, defendant and the ex-girlfriend broke up after she discovered he was cheating on her with another woman. They had been living together and have two children.

At trial, the ex-girlfriend testified that defendant got violent when she confronted him about the cheating. He pushed her, pulled her hair, punched and slapped her. At one point, she went to move her car, fearing defendant and his brother would vandalize it. When she returned, defendant wouldn't let her in the house. She testified that he then pushed her on the floor, stomped her leg, and threw several bottles at her. He then chased her down the street, throwing a firecracker at her and shooting a gun.

The ex-girlfriend soon returned to the house, gathered her children and some clothes, and left for her mother's house, where she stayed for several days. At some point, she and defendant met at their house, along with police, so defendant could retrieve

---

[3] When the man shot, the time stamp on the video was 7:22 a.m. An investigating officer testified that the timestamp was behind by "approximately an hour and ten minutes."

his possessions.  Sometime after that, defendant sent her a text message:  " 'Ya all shit fucked up.  It's like not even liveable anymore.' "

She returned to her home to find it " 'looked like a construction site.' "  The kitchen, her bedroom, and her daughter's bedroom were destroyed.  Cabinets and the staircase bannister were gone.  And holes dotted the walls throughout.

After she filed a request for a restraining order, defendant told her:  " 'A restraining order isn't anything but a piece of paper.  Do you think that that's going to save you?' "  He also said something to the effect of:  " 'If you love your family, then you wouldn't go through with that or you wouldn't do that to them.' "

The morning of the shooting, defendant called and said if she "didn't give him his shit" — which she took to mean his extra ammunition magazine and some clothes and shoes he had left behind — he was going to do something to her family members.

### Events Just Before the Shooting

The mother of defendant's ex-girlfriend (and ex-wife of the victim) testified that the day of the shooting, defendant, defendant's brother, and another man came to her house in a small black SUV.  The brother and the other man both had guns.  They complained that someone had vandalized the car of the woman defendant had been cheating with.

When the mother told them her daughter wasn't there, an argument erupted.  The mother eventually called 911, and the men left while she was on the phone.  Defendant yelled that he'd be back to shoot up her house, and " 'I'm going to go over to her father's house.' "

A recording of the 911 call was played for the jury.  In it, the mother told the dispatcher the black SUV was defendant's mother's car, and its license plate began with

4

"7LB."[4]  She also said two of the men wore red shirts, but she did not know if they had weapons.

The mother acknowledged that at the preliminary hearing she had falsely testified defendant had made no threats that morning.  But she did so because she was "protecting [her] daughter and [her] grandchildren."  She also acknowledged that she wrote a letter to the District Attorney's office, recanting her statements to police and asking that the charges be dropped.  She explained she wrote it "[b]ecause the shooters are still out there and we were still in California."  She and her family subsequently moved out of state.

### The Cell Phone Evidence

A Department of Justice specialist testified as an expert in cell site connection data and cell data analysis.  She had examined the cell site connection data of defendant's cell phone for the day of the shooting.

She testified that between 6:00 and 8:00 a.m., the cell site connections of defendant's phone were consistent with being in the area of defendant's mother's house.  Between 8:01and 8:20 a.m., defendant's phone appeared to be in transit.  And within that period, at 8:07 and 8:12 a.m., defendant's cell phone was in the area of the ex-girlfriend's mother's house.

From 8:21 to 8:40 a.m., the expert concluded the phone was in transit, and between 8:26 and 8:30 a.m., "[i]t did connect with one of the closest cell sites to the crime location . . . ."[5]

From 8:41 to 9:00 a.m., the cell site connections were consistent with being in the area of the ex-girlfriend's mother's house or defendant's mother's house.  And from 9:00

---

[4]  The license plate of defendant's mother's black SUV began with "7LB."

[5]  The expert's exhibit shows cell connection to the site near the crime scene at 8:26, 8:27, 8:28, 8:29, and 8:30 a.m.

to 10:00 a.m., the connections were consistent with being in the area of defendant's mother's house.

On cross-examination, defense counsel asked the expert: "So in your expert opinion, I can assume that the cell phone in question relating to [defendant] is within the 1.5 mile radius of Newton Road [a cell site location north of the shooting] at 8:34. [¶] Could he have been at the incident location on Sinclair Avenue where the 9-1-1 call had the shots being fired?" The expert answered: "I don't think the cell site is consistent with him being in the area of the incident location at that time." Counsel clarified, "would that mean that the holder of that cell phone was not at the location of [the victim's house]." The expert answered: "In my opinion, the cell phone is not in the area of [the victim's house] during the time of those cell site hits."

### Defendant's Statement to the Police

Defendant told the police that he, his brother and another man went to the mother's house looking for his ex-girlfriend because someone had vandalized the car of the woman he had been cheating with, and he wanted to talk to his ex-girlfriend about the vandalism. They drove his Mercedes sedan, not his mother's black SUV. Defendant said that after his ex-girlfriend's mother threatened to call the police, he left and went home. Thereafter, he left to get a rental car repaired and then went about his regular day. He denied being involved in the shooting. He also denied having access to any guns or ammunition.

### Recorded Admissions to the Ex-Girlfriend

After the shooting, the ex-girlfriend spoke to defendant on the phone. She recorded the conversation, which was played for the jury. In it, she asked, "oh you ready to kill people," He replied: "I ain't afraid, don't play with my shit hoe." She said: "I just asked you what am I playing with?," to which he said, "for once nigga, I keep telling you nigga. (inaudible) Your mother fucking family nigga. On the real, stop playing with me bitch." And when she asked: "So you sending warning shots? That's what you call

6

yourself doing?," he said, "Yeah nigga, yeah nigga.  My shit nigga."  But when she said, "So you wanta kill… you trying to kill my daddy?  Is that what you trying to do?," there was no response.

Later, in a recorded call from the jail, defendant told her:  "I got ammo on you and your kids,"  "It's gonna be night night" if she snitched, and "Bitches get their heads busted too," which she took to be a threat to shoot her.

## Jury Verdict & Sentencing

The jury found defendant guilty of shooting at an inhabited dwelling (§ 246), assault with a semiautomatic firearm (§ 245, subd. (b)), felon in possession of a firearm (§ 29800, subd. (a)(1)) and felon in possession of ammunition (§ 30305, subd. (a)).  But as to the personal use of a firearm enhancement, the jury found the allegation not true.

The trial court imposed an 18-year four-month aggregate term, calculated as follows:  12 years for assault with a semi-automatic firearm (the middle term doubled for the strike), 16 months for felon in possession of a firearm (one-third the middle, doubled for the strike), and a five-year prior serious felony enhancement (§667, subd (a)).  For the felon in possession of ammunition count, a concurrent four-year term (the lower term doubled for the strike) was imposed.  For the shooting into a dwelling count, the middle term was imposed and stayed pursuant to section 654.

## DISCUSSION

### I.  The New Trial Motion

Defendant contends the trial court abused its discretion in denying his motion for a new trial.  We disagree.

### A.  Additional Background

Following the jury verdict, defendant moved for a new trial, asserting the verdict was contrary to the law or evidence (§ 1181(6)).  He argued (1) the cellphone location evidence did not put him at the scene of the shooting; (2) the surveillance video did not show him as one of the shooters; (3) the clothing worn in the video did not match the

7

description of the shooters' clothing before the shooting; (4) the victim's testimony was not believable; (5) the ex-girlfriend's mother's testimony was not credible; and (6) the victim's testimony identifying defendant as a shooter should carry no weight. (see fn. 2, *ante*.)

The trial court denied the motion. Doing so, it made clear its duty on a new trial motion: "the test for the Court is the Court must independently examine all the evidence to determine whether there is sufficient evidence to prove each required element of each crime beyond a reasonable doubt. … [W]hat the Court looks at is I properly weigh the evidence and decide whether or not it's sufficiently credible to support the verdict." Before discussing the evidence, the court stated: "The Court has independently reviewed the evidence and I find the following to be true."

The court explained that it found the mother's 911 call credible. In it, "[s]he says the defendant is at her house with two others, so there would be a total of three people. All three parties are identified as black. She says two of them have red shirts on and they are threatening her. She also says that they're in a black SUV, and they said that they will be back to shoot up the house. And she then gives the first part of the license plate . . . ." The court, however, did not accept her testimony that the men had weapons but noted "what's significant is what she said in the 911 call."

The trial court similarly found the victim credible as far as the damage to his house, but it did not find his identification of the defendant as the shooter credible.

The court found the neighbor's testimony and 911 call, which came in at 8:36 a.m., credible, explaining, "[w]hat this means . . . is the shooting happened before 8:36." It added, the neighbor saw a black SUV with someone in the driver's seat and two people running to it, "both of them are wearing red, which is exactly the same description [the mother] gave on her 911 call." The court also found there was sufficient time for defendant to get from the mother's house to the victim's house.

8

As to the ex-girlfriend, the court explained: "The question is . . . why was [the ex-girlfriend] allowed to testify?  Her testimony did not come in for the purposes of an ID to the crime because she wasn't there.  Her purpose was motive.  Why would the defendant shoot up her father's house?"  The court then noted it did not find all the ex-girlfriend's testimony credible:  "I don't believe all the stuff she said the defendant did to her."  "But," the court continued, "I do believe the defendant vandalized her home.  I do believe that they had a rocky relationship.  I do believe the defendant cheated on her, and she established a motive."

Turning to the cell phone evidence, the court found the expert credible.  Noting the shooting must have preceded the neighbor's 8:36 a.m. 911 call, the court explained:  "We have cell phone data showing where the defendant's phone was at 8:28, 8:26, 8:29, and 8:30.  The cell phone was pinging off the tower nearest to the crime scene . . . .  Then at 8:33 and 8:34 we can see . . . the defendant's cell phone moving away from the crime scene location."

The court continued:  "And also the opposite is true.  We see the defendant's cell phone moving towards the crime scene in the times before the shooting at 8:23 and 8:24. . . . At 8:24 and 8:25 we see the cell phone moving . . . .  He's going from the area of [the ex-girlfriend's mother's] house and he's moving to the [area of the victim's house].  So this puts his cell phone at the scene when the crime occurred."

Turning to the surveillance video, the court explained:  "You can't see the [shooter's] face.  I think that's very obvious.  However, what the video does show, it looks like a male in the video.  We see the male has red in his shirt.  We see the person in the crime scene holding a gun in his hand.  We see him shooting at [the victim's] house.  And then later in the video we see another male running away from the shooter and we also see a black SUV in the video.  This all supports what [the neighbor] had to say.  This all supports what [the mother] had to say.  And when I put all the credible evidence together, I find it sufficient to support the verdicts — all the verdicts in this case.  We've

9

got three black males in an SUV at [the victim's] house looking for [the ex-girlfriend], threatening [the mother], wearing red shirts, and then 20 minutes later they show up to [the victim's] house, three black males in an SUV wearing red shirts, and we see the defendant's cell phone ping in that location, and he has the motive to commit the crime. [¶] Now, the defendant was convicted under — it appeared to be under an aiding and abetting theory as the jury found insufficient evidence to support that he was the actual shooter. And I actually agree with this. There just wasn't sufficient evidence to show the defendant was the actual shooter, but he was the one who masterminded it. He was the one with the motive and he was the one involved in it, even if it can't be proved that he was the shooter."

### B. Analysis

On appeal, defendant argues the court failed to give proper weight to (1) the cellphone location evidence, purportedly showing his phone was not at the victim's house when the shooting occurred; (2) the surveillance video, which showed neither defendant as the shooter nor the SUV's license plate; (3) the mother's inconsistency about the clothing defendant and the other two men were wearing; (4) the ex-girlfriend's status as a spurned former partner of defendant and her unbelievable testimony; (5) the mother's contradictory statements and letter admitting wrongfully implicating defendant; and (6) the victim's inconsistencies about seeing defendant running from his house. We disagree.

"A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*People v. Davis* (1995) 10 Cal.4th 463, 524.) We review a denial of a new trial motion for abuse of discretion. (*People v. Bonilla* (2018) 29 Cal.App.5th 649, 659.) "In doing so, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" (*Ibid.*) "Incompatibility and discrepancies in testimony . . . ; the uncertainties of a witness in giving testimony, as well as

10

contradictions in the evidence, are matters solely for the consideration of the trier of fact in the first instance and for the consideration of the trial judge on a motion for a new trial. Such matters cannot be considered by us . . . ." (*People v. Coelho* (1945) 68 Cal.App.2d 705, 706.)

Here, the trial court acted well within its discretion in denying the new trial motion. As to defendant's arguments that witnesses were biased, inconsistent, or contradictory, we defer to the trial court's credibility findings. As the trial court ably explained, though some aspects of witnesses' testimony were not credible, the guilty verdicts were sufficiently established by the evidence it found credible.

Defendant makes much of the expert's testimony that, "In my opinion the cell phone is not in the area of [the shooting] during the time of those cell site hits." But defendant's argument rests on the assumption that the shooting occurred later than the evidence suggests. As the trial court explained, the neighbor's 8:36 a.m. 911 call put the shooting sometime before that. And defendant's cellphone location put him in the area of the shooting at 8:26 through 8:30 a.m. Moreover, the neighbor described certain things he did and observed before making the 911 call – he heard the shots, he went to the window, he observed two men running toward an SUV, he watched them get into the SUV, he watched the SUV drive off in the direction of the freeway and then at some point thereafter, he called 911. The fact that defendant was just outside the area of the shooting by 8:34 a.m. is not inconsistent with him being at the shooting location at the time of the shooting.

And though the surveillance video did not capture every aspect of the shooting, nothing about the video was inconsistent with defendant's involvement in the shooting. Indeed, the prosecution argued defendant was culpable as an aider and abettor, as an alternative to defendant being a shooter, and the jury was so instructed. Thus the evidence need not establish defendant was a shooter.

11

The trial court acted well within its discretion in denying the new trial motion.  We find no error.

## II.  Substantial Evidence — Shooting into an Inhabited Dwelling and Assault with a Semiautomatic Firearm

Defendant contends insufficient evidence supports his conviction for shooting into an inhabited dwelling and assault with a semiautomatic firearm.  He argues no direct evidence identifies him as the shooter or places him at the victim's house during the shooting.  He also argues that circumstantial evidence from the cell phone location data pointed to innocence, hence the jury was required to acquit under the law outlined in CALCRIM No. 224.[6]  We disagree.

Where the sufficiency of the evidence is challenged on appeal, we review the record in the light most favorable to the judgment to determine whether it discloses substantial evidence.  (*People v. Snow* (2003) 30 Cal.4th 43, 66.)  Substantial evidence is evidence that is "reasonable, credible and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*Ibid*.)  This standard of review also applies where the prosecution relies mainly on circumstantial evidence. (*People v. Harris* (2013) 57 Cal.4th 804, 849.)  And though a jury must acquit if it finds circumstantial evidence susceptible to two interpretations — at least one suggesting innocence — on appeal, if the circumstances reasonably justify the jury's finding, we will not reverse if a contrary finding could also be reconciled.  (*Id*. at pp. 849-850.)  Nor will we reverse based on conflicts or suspect testimony.  (*Id*. at p. 850.)

---

[6]  CALCRIM No. 224 provides in part:  "If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

Here, substantial evidence supports the jury verdict. As catalogued by the trial court, the evidence establishing guilt was overwhelming. The evidence established a motive: either the breakup with the ex-girlfriend, the restraining order, the belief the ex-girlfriend vandalized the paramour's car, or a combination of those circumstances. The girlfriend's mother put defendant at her house, along with his brother and another man, where he threatened her and said he was going to come back and shoot up her house. Also a black SUV like his mother's, and his own words — "I'm going to go over to her father's house" — put him at the crime scene. Further, two of the men at the mother's house wore red and the men at the shooting scene wore red. And later, defendant did not deny his involvement when his ex-girlfriend asked: "So you sending warning shots? That's what you call yourself doing?" Instead, he replied: "Yeah nigga, yeah nigga. My shit nigga."

And again, the cellphone location evidence was not exculpatory. Indeed, the cell phone evidence was extremely damaging to defendant's case. Not only did it put defendant in the area of the victim's house around the time of the shooting, it contradicted his statement to police that he went back home after the ex-girlfriend's mother threatened to call the police, and then went to get a rental car repaired before going about his day. The cell phone evidence placed defendant around the ex-girlfriend's mother's house between 8:07 and 8:12 a.m., the area of the shooting between 8:26 and 8:30 a.m., and back in the area of the ex-girlfriend's mother's house or his own mother's house from 8:41 to 9:00 a.m. and then back at his mother's house at 9:00 a.m.

Substantial evidence supports the convictions for shooting into an inhabited dwelling and assault.

### III. Substantial Evidence — Felon in Possession of a Firearm and Ammunition

Defendant contends insufficient evidence supports his convictions for felon in possession of a firearm and ammunition. He argues, no firearm was recovered, and though the ex-girlfriend later turned over a loaded ammunition magazine to police, she

13

was a "wholly biased witness," and the magazine was provided over a year after the shooting. He notes the jury rejected the theory that he was the shooter. And though he recognizes constructive possession can establish possession, he argues no nexus links him to an actual firearm and ammunition. We disagree.

### A. Additional Background

At trial, the ex-girlfriend described defendant's guns as "two pretty big ones" as well as "the one that he carried on a daily basis," which she described as black and "regular just handgun." Asked how she knew he had the gun almost every day, she explained, "Because we lived together and I seen him leaving the house with it, coming home with it, leaving it in the car." Similarly, when the mother was asked, at trial, how often she had seen defendant with a gun, she testified, "Too often."

The ex-girlfriend also testified that before moving out of the home she had shared with defendant, she gave defendant's extra handgun magazine, which had been in her closet, to the police.[7] She explained: "It was just basically an extra clip that he left laying around, that he didn't need, I guess, because the gun that he had already had a clip in it. So it was just basically an extra one." The magazine had been something that defendant had wanted to get, when he demanded to "get his shit out of the house." She also explained that because she was moving, she felt comfortable turning it over to police.

At trial, an expert testified that the magazine was for a .40-caliber Glock, and ammunition in the magazine was of the same caliber and manufacturer as shell casings found at the crime scene. Additionally, the firing pin impressions on the shell casings found on the scene indicated they were fired from a single .40-caliber Glock.

---

[7] An officer testified to the ex-girlfriend giving him a 10-round magazine with four bullets in October of 2017, 15 months after the shooting.

## B. Analysis

Substantial evidence supports the jury verdicts as to the gun and ammunition possession counts. That defendant possessed a gun was established by the ex-girlfriend and corroborated by the mother's testimony. The shooting itself further established gun possession by perpetrators defendant rode with and aided and abetted. Indeed, the ammunition from the Glock magazine, that had been in the home defendant and his ex-girlfriend shared, matched the brand and caliber of casings found at the crime scene and those shell casings were fired from a .40-caliber Glock firearm. And as defendant acknowledges, one can possess a firearm without holding it, so long as one has the right to control and access it.

The ammunition possession was similarly established by the ex-girlfriend's testimony that the magazine she gave to the police was defendant's extra magazine that he kept at the house when they were living together. Defendant's argument that the ex-girlfriend gave "biased testimony" is unavailing. Again, appellate courts "resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

Defendant, however, argues that "the information pled possession only [on the date of the shooting] and none was proven." In fact, the information alleged possession of the gun and ammunition "*On or about* July 27, 2016," the day of the shooting. " '[W]hen it is charged that an offense was committed "on or about" a named date, the exact date need not be proved unless the time "is a material ingredient in the offense" …, and the evidence is not insufficient merely because it shows that the offense was committed on another date.' " (*People v. Garcia* (2016) 247 Cal.App.4th 1013, 1022.) In defendant's case, the evidence put defendant's possession of the gun and ammunition on the day of the shooting and around that time.

## IV. Failing to Instruct on Alibi Defense

Defendant contends the trial court erred in failing to sua sponte instruct the jury on alibi defense with CALCRIM No. 3400.[8]  Alternatively, defendant argues his trial counsel rendered ineffective assistance in failing to request the CALCRIM No. 3400 instruction.  He argues no possible reason could support the failure to request the instruction.  We find neither instructional error nor ineffective assistance of counsel.

Defendant acknowledges that our Supreme Court has held no duty exists to instruct sua sponte on alibi.  (See *People v. Freeman* (1978) 22 Cal.3d 434, 437 [" 'in the absence of any request . . . it is not the duty of the trial court to give a specific charge upon [alibi]' "]; *People v. Alcala* (1992) 4 Cal.4th 742, 803–804; see also *Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455 [the decisions of our Supreme Court are binding upon this and all other state courts of California].)

Defendant nevertheless maintains that omitting the alibi instruction violated his federal right to due process, jury trial, and to present a defense.  He argues, the instruction's absence prevented the jury from adequately considering his alibi defense.  We disagree.

Defense counsel argued the significance of the cell phone data to the jury in closing:  "There is one timeframe . . . that is important.  The time of the shooting, the time of [the neighbor's] phone call."  Counsel repeated to the jury, the expert's testimony, based on the cell phone location data at 8:34 a.m., that " '[i]n my opinion the

---

[8] CALCRIM No. 3400 reads in pertinent part:  "The defendant contends [he] did not commit [these] crime[s] and that [he] was somewhere else when the crime[s] [were] committed.  The People must prove that the defendant was present and committed the crime[s] with which [he] is charged.  The defendant does not need to prove [he] was elsewhere at the time of the crime.  [¶]  If you have a reasonable doubt about whether the defendant was present when the crime was committed, you must find [him] not guilty."

16

cell phone is not in the area of [the shooting] during the time of those cell site hits.' "
The absence of CALCRIM No. 3400 in no way inhibited this defense.

Further, "with respect to an alibi defense, it is sufficient that the jury be instructed generally to consider all the evidence, and to acquit the defendant in the event it entertains a reasonable doubt regarding his or her guilt." (See *People v. Alcala, supra,* 4 Cal.4th at pp. 803–804.) Here, the jury was appropriately instructed that a defendant is presumed innocent, which "requires that the People prove a defendant guilty beyond a reasonable doubt." It was also instructed to "consider all the evidence" in determining whether the prosecution had met its burden, and unless defendant is proved "guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

We similarly reject the claim of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show the asserted deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674, 693-694, 696] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never an easy task.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 642] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 357 [176 L.Ed.2d 284, 297].)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter, supra,* 562 U.S. at p. 104.) To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra,* 466 U.S. at pp. 693-694; *Ledesma, supra,* 43 Cal.3d 171 at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694; accord, *Ledesma, supra,* 43 Cal.3d at p. 218.) The likelihood of a different result must be substantial, not just conceivable. (*Richter, supra,* 562 U.S. at p. 112.) Under the circumstances here, defendant has failed

17

to show prejudice. CALCRIM No. 3400 would not have produced a more favorable result.

## V. Cruel and Unusual Punishment

Defendant contends his 18-year four-month sentence is cruel and/or unusual in violation of the federal and California Constitution. We reject this contention as frivolous.

First, while defendant filed a statement in mitigation, a *Romero*[9] motion, and an opposition to the prosecution's sentencing recommendation,[10] no cruel and/or unusual punishment claim was made in the trial court. Failure to make the claim in the trial court forfeits the claim on appeal. (*People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. DeJesus* (1995) 38 Cal.App.4th 1, 27.)

Second, on the merits, while defendant cites a litany of Eighth Amendment cases, none are germane to his sentence. (See e.g. *Brown v. Plata* (2011) 563 U.S. 493, 499 [179 L.Ed.2d 969] [constitutional violations in California's prison system]; *Graham v. Florida* (2010) 560 U.S. 48, 52–53 [176 L.Ed.2d 825] [juveniles sentenced to life in prison without parole for nonhomicide crimes]; *Roper v. Simmons* (2005) 543 U.S. 551, 555–556 [161 L.Ed.2d 1] [execution of juveniles older than 15 but younger than 18 when capital crime was committed]; *U.S. v. Bajakajian* (1998) 524 U.S. 321, 324 [141 L.Ed.2d 314] [forfeiture of $357,144 for failure to declare the transportation of more than $10,000 in currency]; *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 563 [134 L.Ed.2d 809] [$2 million punitive damages to car purchaser who was not told his new car had been repaired].)

---

[9] *People v. Romero* (1996) 13 Cal.4th 497.

[10] The prosecution recommended that the court sentence defendant to an aggregate term of 25 years.

Third, beyond those cases, defendant blanketly asserts that his sentence was cruel and unusual because no one was injured. He adds that his sentence "will be an expensive and purposeless waste, especially in current times of prison overcrowding." Defendant has in no way established the sentence imposed was grossly disproportionate to these violent crimes.

Indeed, it seems extremely fortuitous that nobody was injured by the hail of .40-caliber gunfire for which defendant was responsible. And this was not defendant's first conviction for assault with a firearm. As the People have noted, defendant was sentenced as *a recidivist* who committed this violent crime after having been given multiple grants of leniency. In 2007, defendant was convicted of possession of cocaine for sale. He was granted probation before twice violating probation and serving a prison sentence. In 2010, he was again convicted of possession of cocaine for sale and granted probation. Later that year, he was convicted of assault with a firearm and granted probation. In 2013, he again violated probation and received additional jail time. In 2014, he violated probation once more and received 810 days in jail. And in 2017, he was convicted of reckless driving while evading a peace officer and was sentenced to two years eight months.

And in this case, instead of imposing the upper term doubled, the trial court imposed the midterm doubled for the assault with a semi-automatic firearm count. The aggregate sentence imposed was not unconstitutional.

## VI. Section 654

Defendant challenges the concurrent terms imposed for possessing ammunition and possessing a firearm as a felon. He maintains section 654 proscribes such punishment here because the two crimes arose from the same act of possessing the gun. We disagree.

Though a person may be convicted of more than one crime for the same act, section 654 proscribes multiple punishments for the same act. (§§ 654, 954; *People v.*

19

*Correa* (2012) 54 Cal.4th 331, 337.) When it comes to ammunition and guns, section 654 bars multiple punishment if all of the ammunition is loaded into the firearm, and the possession of both is an "indivisible course of conduct." (See *People v. Lopez* (2004) 119 Cal.App.4th 132, 138.) But where that is not the case, punishment for both possessing a gun and ammunition is lawful. (*Ibid*.) And where the trial court makes no express section 654 findings such as here, we consider whether substantial evidence supports an implied finding of separate intent and objective. (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.)

Here, the implied finding of separate intent and objective is supported by substantial evidence. The ex-girlfriend testified that defendant carried a handgun daily. She also testified that defendant kept an extra "clip" at home where the couple had resided: "It was just basically an extra clip that he left laying around, that he didn't need, I guess, because the gun that he had already had a clip in it. So it was just basically an extra one." From that, it could be reasonably concluded that separately possessing the ammunition in the spare magazine was independent of the handgun possession.

### VII. *Dueñas*

Defendant contends remand is required in light of *Dueñas, supra,* 30 Cal.App.5th 1157, which held that due process requires the trial court to stay execution of restitution fines, as well as court operation and conviction assessments, until it has held a hearing and determined the defendant has the present ability to pay. He argues the trial court erred in imposing fines and fees without first determining his ability to pay. We disagree.

At sentencing, the trial court imposed a $1,000 restitution fine (§ 1202.4), a suspended $1,000 parole revocation fine, a $120 conviction fee (Gov. Code, § 1202.45), a $160 operations assessment (§ 1465.8) and a $100 surcharge. No objection was raised to the amount of fines and fees imposed.

The People do not oppose remand given that the cause must be remanded in light of S.B. 1393. But we cannot agree for two reasons. First, the challenge is forfeited for

20

failure to object at sentencing to the amount of fines imposed. Second, we join courts concluding *Dueñas* was wrongly decided.

To the first point, defendant's sentencing predated *Dueñas*, but he still had cause to raise an ability to pay challenge at sentencing. Under section 1202.4, at the time of sentencing, the trial court could consider a defendant's ability to pay when imposing more than the minimum fine. (See § 1202.4 subd. (c) ["Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine"].) Courts have held that where a defendant, sentenced pre-*Dueñas*, fails to raise ability to pay when an above-minimum restitution fine is imposed, a future ability to pay challenge is forfeited both as to the restitution fine as well as to the operation and conviction assessments. (See *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["As a practical matter, if Gutierrez chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"; "even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay because governing law as reflected in the statute (§ 1202.4, subd. (c)) expressly permitted such a challenge"]; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1154 ["Given his failure to object to a $10,000 restitution fine based on inability to pay, Frandsen has not shown a basis to vacate assessments totaling $120 for inability to pay"].) Here, where a restitution fine in excess of the minimum was imposed without objection, the challenge is forfeited.

To the second point, we join courts concluding *Dueñas* was wrongly decided and hold that defendant was not entitled to an ability to pay hearing for the restitution fines and the conviction and operation assessments. (*People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *People v. Hicks* (2019) 40 Cal.App.5th 320, review granted November 26, 2019, S258946; *People v. Aviles* (2019) 39 Cal.App.5th 1055; *People v. Caceres* (2019) 39 Cal.App.5th 917, 923-929.)

On both grounds, remand is unwarranted.

## VIII.  Senate Bill No. 1393

Defendant contends remand is required to allow the trial court to consider exercising its discretion in light of Penal Code section 1385.  The People agree, and so do we.

Effective January 1, 2019, Senate Bill No. 1393 authorizes a trial court to strike, in the interest of justice, a section 667, subdivision (a) prior serious felony enhancement. The bill applies retroactively to cases not yet final.  (*People v. Stamps* (2020) 9 Cal.5th 685, 699; *People v. Jones* (2019) 32 Cal.App.5th 267, 273; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973.)

We agree that remand is appropriate so the trial court may consider exercising its discretion regarding defendant's section 667, subdivision (a) enhancement.[11]

*****

---

[11] In a separate heading, defendant asserts that he has the right to be present with counsel on remand.  He cites in support *People v. Rocha* (2019) 32 Cal.App.5th 352, 359, which held "it is 'manifestly unfair' to permit the trial court to decide how to exercise its new discretion under [an amended firearm enhancement statute] without affording defendant and his counsel the opportunity to make an argument if they so desire."  This issue is not before us and we take no position on *Rocha*.

## DISPOSITION

The cause is remanded so the trial court may consider whether to exercise its discretion to strike or dismiss the five-year section 667, subdivision (a) prior serious felony conviction enhancement in the interest of justice pursuant to section 1385, subdivision (a)/(b).  In all other respects, the judgment is affirmed.


                                                           /s/
                                            MURRAY, J.



We concur:



        /s/
RAYE, P. J.



        /s/
KRAUSE, J.

23